[Civ. No. 766. Fifth Dist. July 24, 1967.]

ROSE L. BARKER, Plaintiff and Appellant, v. CALIFOR-
NIA-WESTERN STATES LIFE INSURANCE COM-
PANY et al., Defendants and Respondents.

770

O'Connor & Lewis and Ewart Lytton Merica for Plaintiff and Appellant.

Downey, Brand, Seymour & Rohwer and Richard G. Worden for Defendants and Respondents.

GARGANO, J.—Respondents for several years prior to the institution of this action had been writing ordinary group life insurance on the lives of California veterans insured under the commonly called "Cal-Vet" loan program, pursuant to certain agreements which they entered into with the California Department of Veterans Affairs. By supplemental agreement dated January 20, 1960, effective February 1, 1960, the respondents agreed to increase the life insurance benefits on the lives of the insured veterans; they also agreed to provide additional indemnity in the event of accidental death or death by accidental means. However, the supplemental policy which was submitted to and approved by the state Insurance Commissioner contained the following limiting provision with regard to the additional benefit for accidental death: "*Commission of a Felony*: The company shall not be liable for any loss to which a contributing cause was the insured's commission or attempt to commit a felony."

Appellant's husband, Lester A. Barker, a California veteran, was killed during the early morning hours of February 7, 1960, as the result of a head-on collision on Elvas Freeway at the Arden intersection in Sacramento. The collision, which resulted in the death of another person as well, occurred between an automobile which Barker was driving north on the southbound lanes of the highway (on the wrong side of the freeway), and a vehicle which was traveling south in the

southbound lanes. Shortly before the accident appellant and her husband had been guests at a party at the Eagle's Hall in Sacramento, where Barker had been drinking heavily and had fallen several times. After the accident a blood test of Barker's blood taken from his body during the autopsy indicated that it contained .18 percent alcohol by weight.

At the time of his death Barker's life was insured under the "Cal-Vet" loan program. He was also insured under the supplemental agreement of February 20, 1960, although he had not yet received his copy of the policy and apparently was not aware of the existence of the additional insurance. After Barker's death respondents paid appellant, as sole beneficiary, all life insurance benefits to which she was entitled under their insurance policies, but refused to pay the additional benefit for death resulting by accidental means amounting to approximately $12,859.06. Accordingly, appellant instituted this action in the Superior Court of Sacramento County for breach of contract and declaratory relief. The cause was tried before the court sitting without a jury, and at the conclusion of the trial judgment was entered by the court in favor of respondents. The court expressly found that Barker's death was caused by accidental means, but concluded that appellant was not entitled to recover the additional indemnity benefit because a contributing cause to the insured's death was the insured's commission of a felony. Appellant appeals from this judgment.

Respondents initially contended (by way of affirmative defenses) that they were not liable to appellant under the supplemental policy because Barker's death did not result directly and independently of all other causes from accidental means, and that a contributing cause to his death was the commission of or the attempt to commit a felony. Appellant therefore spends considerable time and effort in her brief in pointing to certain inconsistencies in the policy (and to a letter written by an agent of respondent California-Western States Life Insurance Company) in order to demonstrate that the decedent Leslie A. Barker was insured for accidental death as well as for death resulting by accidental means. However, during the trial respondents abandoned the defense that Barker's death did not result by accidental means and do not assert the defense in this appeal. Thus, the only questions presented herein are:

I. Is felony drunk driving as defined in Vehicle Code sec-

tion 23101 a felony within the exclusion clause contained in the supplemental policy?

II. If so, is a conviction essential before the felony is deemed committed under the exclusion clause?

III. Is the exclusion clause invalid or otherwise unenforceable against this appellant?

IV. Assuming that the exclusion clause is valid and enforceable, is there sufficient evidence in the record to support the trial court's finding and conclusion of law that the decedent Leslie A. Barker had committed a felony prior to his death, and that this felony was a contributing cause thereto?

I

Vehicle Code section 23101 defines felony drunk driving as follows: "Any person who, while under the influence of intoxicating liquor, or under the combined influence of intoxicating liquor and any drug, drives a vehicle and when so driving does any act forbidden by law or neglects any duty imposed by law in the driving of such vehicle, which act or neglect proximately causes bodily injury to any person other than himself is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison for not less than one year nor more than five years or in the county jail for not less than 90 days nor more than one year and by fine of not less than two hundred fifty dollars ($250) nor more than five thousand dollars ($5,000)." ▮ Hence, it is clear that under this section any person who (1) while under the influence of intoxicating liquor and while driving a vehicle (2) does any act forbidden by law or neglects any duty (3) which results in the death or injury of someone else commits a felony. This is so because the section categorizes the offense as a felony and provides that upon conviction thereof the offender shall be punished by imprisonment in the state prison or by imprisonment in the county jail. ▮ It is settled that if an offense is punishable either as a felony (by imprisonment in the state prison) or as a misdemeanor (by imprisonment in the county jail), it is deemed a felony for all purposes up to the imposition of sentence (Pen. Code, § 17; *People* v. *Banks,* 53 Cal.2d 370 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Williams,* 27 Cal.2d 220 [163 P.2d 692]; *People* v. *Lippner,* 219 Cal. 395 [26 P.2d 457]; *Doble* v. *Superior Court,* 197 Cal. 556 [241 P. 852]).

Appellant asserts, however, that this is not and cannot be so

as to an offense punishable by imprisonment in the state prison or by imprisonment in the county jail in the absence of a conviction. In fact, she asserts that the common law background of the word "felony" and the historical background of Penal Code section 17 unequivocally indicate that a felony is a crime which "must" be punishable by imprisonment in the state prison, and does not and cannot include a crime which merely "may" be punishable in the discretion of the court in the state prison. Consequently, she concludes that since the felony exclusion clause contained in the policy does not specifically refer to Vehicle Code section 23101, and since this section provides for an alternate penalty, the decedent Barker did not and could not have committed a felony because he was not charged with a felony nor convicted after a charge, nor was he sentenced to a state prison after conviction.

Although it may be true (as appellant contends) that the decisions holding that an offense punishable either by imprisonment in the state prison or by imprisonment in the county jail is deemed a felony for all purposes up to the imposition of sentence are cases in which the defendant had been convicted, they do not by implication or otherwise require a conviction as an essential factor. To the contrary, in *Doble* v. *Superior Court, supra,* 197 Cal. 556, the offense was punishable as a felony or misdemeanor, depending upon the imposition of sentence, and no charge had been lodged against defendant within the period prescribed by the statute of limitations for misdemeanors. The court held, however, that the statute of limitations relating to felonies was applicable because the offense was treated as a felony for all purposes up to the imposition of sentence. Consequently, by implication at least, the court held that such an offense is to be treated as a felony even prior to the lodging of a charge or to a conviction. Moreover, as we have stated, Vehicle Code section 23101 itself categorizes the offense a felony, and it is the *actual* imposition of a jail sentence that reduces it from a felony to a misdemeanor (*People* v. *Trimble,* 18 Cal.App.2d 350 [63 P.2d 1173]). If the Legislature may classify offenses as felonies or misdemeanors as it chooses (as it has done in Penal Code section 17 by the nature and imposition of the sentence), it necessarily follows that it may classify a particular offense as a felony up to the actual imposition of sentence as it has done in Vehicle Code section 23101. Thus, the rule articulated in

*People* v. *Trimble, supra,* 18 Cal.App.2d 350, that an offense categorized by the Legislature as a felony is reduced to a misdemeanor if a misdemeanor sentence is imposed, should not and must not be extended to a case where no sentence has been imposed for whatever reason (See 11 So.Cal.L.Rev. 298).

■ Accordingly, we conclude that the offense described in section 23101 must be deemed a felony for all purposes (including the determination of the contractual rights of the parties under an insurance policy) unless the offense was actually reduced to a misdemeanor after conviction by the imposition of a fine or by imprisonment in the county jail.

## II

■ Appellant's second contention that decedent, Leslie A. Barker, did not and could not have committed a felony which contributed to his death is simply that there can be no "commission of a felony" until there has been a conviction thereof. However, we are again impelled to disagree. Significantly, the exclusion clause does *not* state that the insurance company shall not be liable for any loss to which a contributing cause was the insured's *conviction* of a felony. It states simply that the company shall not be liable for any loss to which a contributing cause was the insured's *commission* of or *attempt* to commit a felony. It is manifest that the term "commit" (which means to do; to effect or perpetrate) is not synonymous with, nor does it have the same meaning as, the term "convict" (which means to prove or find guilty of a criminal charge [Webster's Dictionary; Black's Law Dictionary]). Also, significantly, the exclusion clause relates primarily to a death benefit and obviously contemplates the death of the insured while he is engaged in the act of committing or attempting to commit a felony, or shortly thereafter. Hence, it is apparent that such an exclusion clause would have little if any meaning if a conviction were also required.

It is of course true that ambiguous clauses in insurance policies are to be interpreted against the insurer. However, there is no ambiguity in this clause, and we conclude that a reasonable person of average intelligence, seeking insurance of the nature provided in the policy, who read the clause would have understood it to mean that the insurance carrier was relieved of liability if the conduct contributing to the insured's death was deemed felonious under the laws of this state.

## III

Appellant's remaining contentions are that the exclusion clause is invalid and is unenforceable against appellant. For example, she asserts that if such conduct as that specified in Vehicle Code section 23101 is a felony, it would be possible for an insurance company to subserve its own interest by prevailing on the Legislature to adopt new laws from time to time which would increase the area of prohibited conduct, thereby minimizing its risk under a policy which it had already issued. She concludes that it is the evil tendency (and not the actual result) which is the test of illegality. This assertion, however, borders on the absurd. It assumes that an insurance company could successfully prevail on a state legislature to declare certain specified conduct felonious, thereby affecting every citizen of the state, merely to assist the insurance company to avoid its contractual commitments.

Appellant argues next that respondents could have protected themselves by excluding losses sustained in consequence of the insured's being intoxicated, and since they did not choose to use this language they are now precluded from using a felony clause to accomplish the same purpose. It is difficult to understand why, if respondents could have protected themselves from liability from a death resulting from or contributed to by the insured's mere intoxication (as appellant apparently admits), it is not and should not be protected by a more restrictive felony clause which in addition to intoxication also requires the insured to do a forbidden act while driving a vehicle which causes injury or death to someone else. In other words, it is clear that the respondents could have increased the excluded risks, thereby minimizing the area of liability, by inserting a simple intoxication clause, and it follows that it should be protected under a felony clause which provides greater coverage for the policyholder by narrowing the area of exclusion.

Third, she contends that the felony clause is invalid because it does not conform with the precise wording of section 10369.11 of the Insurance Code; i.e., it does not contain a caption, nor does it refer to an illegal occupation. This argument, however, is unavailable to appellant because the section applies only to a disability policy, and then only if it is not supplemental to a life insurance policy. As we have indicated, the main policy under which Barker was insured in the instant case was ordinary life insurance, and the supple-

mental policy merely increased the life insurance benefits and added an additional benefit in the event of death by accidental means.[1]

 Appellant asserts that the felony exclusion clause is not binding, because it violates her constitutional rights and is against public policy. We have considered appellant's extensive arguments in this respect and deem them to be entirely without merit. In fact, we see no reason why an insurance company may not limit its risk under a policy so as to exclude felonious conduct. To the contrary, by legislative declaration, in this state at least, such clauses are not deemed to be against public policy.[2] Moreover, similar clauses have been upheld by the courts of our sister states (*Mainer* ·v. *American Hospital & Life Ins. Co.* (Tex.Civ.App.) 371 S.W.2d 717; *Redman* v. *Western & Southern Life Ins. Co.* (Mo.App.) 187 S.W.2d 842; *Lubianez* v. *Metropolitan Life Ins. Co.*, 323 Mass. 16 [79 N.E.2d 876]). In *Mainer* the insured

---

[1]Section 10369.11 is a part of chapter 4 of division 2 of the Insurance Code entitled ''Standard Provisions and Disability Policies.'' Section 10271, which is also a part of chapter 4, reads as follows:

''Except as provided in Section 10292, this chapter shall not apply to or in any way affect life insurance, endowment or annuity contracts *or contracts supplemental thereto which contain only such provisions relating to disability insurance as (a) provide additional benefits in case of death or dismemberment or loss of sight by accident* or as (b) operate to safeguard such contracts against lapse, or to give a special surrender value, or special benefit, or an annuity, in the event that the insured or annuitant shall become totally and permanently disabled as defined by the contract or supplemental contract.'' (Italics added.)

Section 10292 (referred to in section 10271) is not helpful to appellant, because it simply provides that a supplemental contract of the kind involved in this case shall not be issued or delivered until a copy of the form thereof is submitted to, and approved by, the commissioner (which was done in the instant case), and that the commissioner may make reasonable rules and regulations concerning the provisions in the contract as are necessary to enforce such standards prescribed by chapter 4 as he (the commissioner) finds to be applicable to such contracts. Our independent research indicates that the Insurance Commissioner has not adopted any rules and regulations under this section, and thus it is clear that section 10369.11 is inapplicable to the supplemental contract. Moreover, the Insurance Commissioner authorized the issuance of the supplemental policy relating to the additional death benefit for death resulting by accidental means, and it must be assumed that he also approved the wording of the felony exclusion clause therein.

Significantly, the Insurance Commissioner marked that portion of the supplemental policy relating to additional life insurance benefits as follows:

''Return to Sender
 Filing or Approval
 Not Required by Law.''

[2]See Insurance Code section 10369.11 relating to disability insurance.

was operating an automobile under the influence of alcohol while driving on the wrong side of a limited access, divided highway. He collided head-on with an oncoming car, causing his own death and that of the other driver. The policy contained a supplemental benefit provision for accidental death, with an exclusion if the death of the insured resulted from committing a felony. In denying coverage under this exclusion clause, the court not only upheld its validity, but obviously found that a conviction was not a prerequisite to the commission of a felony.

Finally, appellant argues that in any event the exclusion clause is unenforceable because respondents never notified Barker that the accidental death amendment was in effect and did not furnish him with a copy of the policy. Accordingly, she argues that she comes within the rule that if the terms of a purported exclusionary provision of an insurance policy are not called to the attention of the person who received it, he is not bound thereby (*Steven* v. *Fidelity & Casualty Co.*, 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284], and *Raulet* v. *Northwestern etc. Ins. Co.*, 157 Cal. 213 [107 P. 292]).

Significantly, the supplemental insurance policy in the instant case was not negotiated or purchased directly by Barker from the respondents. It was negotiated and purchased by the Department of Veterans Affairs for the benefit of California veterans who were insured under the "Cal-Vet" loan program, and who would thereafter agree to pay the additional premium. Consequently, unlike *Steven* and *Raulet,* this is not a case where an insured who was seeking certain specified insurance coverage negotiated and purchased the insurance without having his attention directed to the fact that the policy contained certain exclusions which substantially limited or affected the coverage which he was seeking to purchase. Moreover, it is apparent that the parties who negotiated the contract (the Department of Veterans Affairs and respondents) contemplated a reasonable delay between the effective date of the additional coverage and the date when all veterans already insured under the program would be notified and would secure their copies of the policy.[3] On the one side

---

[3]This is indicated by the nature of the coverage and by the contract itself. The coverage is group insurance for the numerous veterans insured under the "Cal-Vet" program. In this respect, the supplemental contract provides that the monthly premium charged for the increased

of the coin appellant asserts that she may claim the benefits of a supplemental insurance policy which was not negotiated or directly purchased by her husband even though his death occurred only seven days after the policy's effective date (and well within the period that he could have refused the benefits of the new policy and secured a refund of any premiums charged against him), and even though he was apparently unaware of the additional coverage; this claim is undisputed by respondents. On the other side of the coin appellant claims that she may reject a valid exclusionary clause or limitation which is an integral part of this same policy simply because the insured had not been notified of the policy and was unaware of its contents. It is this later claim which respondents reject, and which we find to be not only unreasonable but completely untenable.

## IV

It is undisputed that the decedent Leslie A. Barker was driving an automobile on the wrong side of a divided highway, resulting in an accident which also killed another person. In contending that respondents failed to establish their defense that Barker had committed a felony under Vehicle Code section 23101, however, appellant argues that there is not sufficient admissible evidence to sustain the trial court's finding of fact that at the time of the accident Barker was under the influence of intoxicating liquor, an essential element to the commission of the crime. She further contends that respondents had the burden of proof on this issue and failed to sustain this burden by a preponderance of the evidence.

It is the rule on appeal that an appellate court does not weigh the evidence or judge the credibility of witnesses in order to determine whether the party having the burden of proof has established his proof by a preponderance of the evidence. To the contrary, the appellate court must view the evidence in the light most favorable to respondent, indulging all intendments and reasonable inferences in his favor, and

amount of life insurance and accidental death due for any month between February 1st and May 1st, 1960, could be paid out of the reserve accumulated by the insurance company, and at the option of the department later charged against the respective accounts of the contract holders who were covered by such benefits during such period. Furthermore, the contract holders (the insured veterans) were given a period of 90 days to reject the benefits of the new coverage, and if they did so by notifying the department in writing, all premiums collected by the company for that period would be refunded.

the court may not disturb the finding of the trier of fact if there is substantial evidence in the record in support thereof (*Berniker* v. *Berniker*, 30 Cal.2d 439 [182 P.2d 557]).

■ Accordingly, we conclude that there is substantial evidence in the record to support the trial court's decision on the issue of Barker's intoxication. First, he was driving his vehicle on the wrong side of a divided highway, indicating that he did not have full control of his faculties. Second, shortly before the accident he attended a party at the Eagle's Hall in Sacramento where (according to appellant's own statements) he had been drinking heavily and had fallen several times. Third, Barker's blood alcohol was .18 percent by weight, and a qualified criminologist testified that any person whose blood contained this quantity of alcohol would be under its influence.

Appellant also asserts that the written report of the Bureau of Criminal Identification and Investigation of the State of California, containing the result of the blood alcohol test which was made in its laboratory on Barker's blood, was improperly introduced into evidence because respondents failed to lay an adequate foundation. However, this assertion is not supported by the record. In fact, the Supreme Court has approved the admission of a report of a blood test under remarkably similar circumstances (*Nichols* v. *McCoy*, 38 Cal.2d 447 [240 P.2d 569]).

In the instant case the record shows the following. The deputy coroner who investigated the accident testified that he arrived at the scene shortly after the accident occurred and that he made the identification of Barker's body by examining decedent's personal effects and from statements made by appellant. He further testified that he removed the body and delivered it to the county morgue. Dr. Wallace, the autopsy surgeon, testified that he followed the routine practice generally followed in such cases when he made the autopsy of Barker's body. Specifically, he testified that he made the autopsy on the body identified to him as decedent's (apparently by the deputy coroner who investigated the accident and delivered the body); that he removed a quantity of blood from the body and placed it in a bottle; that he placed the bottle in an envelope and in turn placed the envelope on a table in the autopsy room; and that before doing so he indicated on the envelope that it contained Barker's blood and identified it with his own initials. A second deputy coroner

testified that he picked up the envelope from the refrigerator in the autopsy room and delivered it to the laboratory of the Bureau of Criminal Identification and Investigation. He further testified that before doing so he filled out a receipt which was signed by the laboratory assistant to whom he delivered the envelope, stating that Barker's blood had been delivered to the laboratory for a blood alcohol test. David Q. Burd, a criminologist employed in the laboratory of the Bureau of Criminal Identification and Investigation for approximately 23 years, identified the bureau's report of the blood test made on Barker's blood which was introduced into evidence. Specifically, he explained in detail the customary manner in which blood was analyzed in the laboratory for blood alcoholic content. He then identified the report which was introduced into evidence as a copy of the official record maintained in the laboratory of the Bureau of Criminal Identification and Investigation, and testified in detail as to its mode of preparation. In this connection, he stated that although the office secretaries filled in the preliminary information, it was the customary and routine practice for the chemist who made the test to remove the bottle containing the blood sample from the sealed envelope and to make all entries concerning the result of the test in the official record in his own handwriting. He also testified that the blood alcohol test on Barker's blood had been made by a Mr. Green (then deceased), and that the entires in the record were made in his handwriting in the routine and customary manner.

Appellant assails the testimony of Dr. Wallace because he stated that he took the blood sample from a body identified to him as the body of Leslie A. Barker. Although this testimony is arguably hearsay (as appellant asserts), it is buttressed by sufficient circumstantial evidence of the routine business practice of the coroner's office to warrant its admission. In *Nichols* v. *McCoy, supra,* 38 Cal.2d 447, the embalmer who took the sample of the blood also testified that he was informed of the name of the decedent at the time of the embalming and again the next day when his employer had him sign the embalming certification. Moreover, in the instant case appellant did not object to Dr. Wallace's testimony on the ground of hearsay, and it is settled that hearsay evidence admitted without objection is sufficient to support a finding.[4]

[4]Appellant moved to strike Dr. Wallace's testimony on the ground that his statement relating to the identity of the body was based on hearsay long after the doctor had testified and during the testimony of Mr. Burd.

■ Appellant also contends that there was no showing that Mr. Green who made the blood test for alcoholic content on Barker's blood was qualified to make such a test and to express an opinion. Mr. Burd testified, however, that Mr. Green was a chemist employed in the laboratory of the Bureau of Criminal Identification and Investigation of the State of California, and that he had made numerous blood tests to determine alcoholic content. Thus, it is manifest that there was sufficient evidence for the court to find that the test on Barker's blood had been made by a qualified employee of the Bureau of Criminal Identification and Investigation, and we do not believe that it abused its discretion in this respect.

Appellant's final thrust that respondents' use of a blood sample taken at the coroner's autopsy was improper because the insurance policy simply authorized respondents to examine the body and to make an autopsy, but said nothing about an autopsy made by a governmental instrumentality is so devoid of merit that no further comment thereon is necessary.

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

A petition for a rehearing was denied August 17, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1967.

---

At that time he explained to the court that he did not timely object because he had been lulled into a false sense of confidence by the series of constitutional objections which he had made to the doctor's entire line of testimony. Be that as it may, the record clearly indicates that respondents' counsel called the court's and appellant's attention to the fact that appellant's objections were limited to constitutional questions and did not include the hearsay objection. In fact, the record indicates that the following transpired:

"MR. WORDEN: That objection, however, your Honor, is limited to the constitutional matters that we covered and the privilege matters that we covered; I am correct there? In other words, you are not reserving to the plaintiff an opportunity to object to the question on some other basis, other than the ones that have been argued?

"THE COURT: No. He is objecting on the matters which he has objected to and set forth those objections very, very well and in great detail. That's as far as we go.

"MR. WORDEN: I wouldn't want to be faced with an objection that it is hearsay at a later date.

"THE COURT: Oh, no, no, no, any objections as to form or anything else now, as to competency, these must be made, this is understood; but we are talking about these matters to which Mr. Merica addressed himself before the recess."

Under these circumstances, appellant waived any objection she may have had on the ground of hearsay, and it is apparent that her motion to strike was not timely made (*Powers* v. *Board of Public Works,* 216 Cal. 546 [15 P.2d 156]).